1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BELTAPPO INC., a Washington corporation,

Plaintiff,

v.

RICH XIBERTA, S.A., a Spanish
corporation,

Defendant.

No.  C05-1343Z

ORDER

Plaintiff Beltappo, Inc. ("Beltappo") brings this claim against Defendant Rich Xiberta

S.A. ("Rich Xiberta") for breach of contract.  Complaint, docket no. 1.  Before the Court is

Rich Xiberta's motion to dismiss for lack of personal jurisdiction pursuant to FED. R. CIV. P.

12(b)(2) or, in the alternative, to dismiss under the doctrine of *forum non conveniens*.

Docket no. 21.  Rich Xiberta also requests costs and attorneys' fees pursuant to RCW

4.28.185(5).  Having reviewed Rich Xiberta's motion to dismiss, Beltappo's brief in

opposition, and Rich Xiberta's reply, the Court enters the following Order.

## BACKGROUND

Rich Xiberta

Rich Xiberta is a Spanish corporation with its principal place of business in Caldes de

Malavella, Spain.  Dalmau Decl., docket no. 21, at ¶ 3.  Rich Xiberta produces and sells

wine corks.  Carlson Decl., docket no. 24, Ex. A and B (Rich Xiberta web site).  Rich

ORDER   1–

1   Xiberta has no offices, property, bank accounts, or employees located in the State of

2   Washington.  Dalmau Decl. at ¶¶ 14, 16.  Nor does Rich Xiberta advertise, solicit customers,

3   or sell its products in the State of Washington.  Id. at 17.  Rich Xiberta is the parent company

4   of a wholly owned subsidiary known as Rich Xiberta U.S.A. ("RXUSA").  Second Dalmau

5   Decl., docket no. 29, at ¶ 2.

6   Beltappo

7       Beltappo is a Washington Corporation with its principal place of business in the State

8   of Washington.  Complaint, docket no. 1, ¶ 1.  Beltappo markets and sells synthetic cork that

9   is manufactured by Zamar, S.N.C., an Italian corporation located in Porto Ricanti, Italy.

10  Belforte Decl., docket no. 26, ¶ 2; Dalmau Decl. at ¶ 6.  John Belforte II is Beltappo's

11  President and CEO.  Belforte Decl. at ¶ 1.

12  The Distribution Agreement

13      Rich Xiberta and Beltappo began contract discussions for the sale of Beltappo's

14  synthetic corks to Rich Xiberta through agents in Chile in 2002.  Kinsella Decl., docket no.

15  30, ¶ 4.  In Chile, Beltappo's agent, Brian Kinsella, began contact with Rich Xiberta's agent,

16  Josep Vila, by email.  Id.  Eventually, Vila requested specific information relating to a

17  possible distribution agreement between Beltappo and Rich Xiberta, which was forwarded to

18  Belforte in Washington State.  Id.  In January 2004, Kinsella and Belforte traveled to Spain

19  to further negotiate the terms of a possible distribution contract.  Id. at ¶ 5.  After additional

20  exchanges by email, telephone, and fax, the parties reached an agreement, which was signed

21  in California on June 27, 2004 ("Distribution Agreement").  Belforte Decl. at ¶ 5, Ex. B;

22  Dalmau Decl. at ¶¶ 7-8; Helm Decl., docket no. 21, Ex. C (copy of Distribution Agreement).

23      The Distribution Agreement provides that Rich Xiberta is the exclusive distributor of

24  Beltappo's products world wide, excluding Italy and North America, for a period of five

25  years.  Id. at §§ 2.01(a), 2.03.  The Distribution Agreement also permitted Beltappo to

26  represent Rich Xiberta's natural cork products in North America, although it appears

ORDER  2–

Beltappo never sold any of Rich Xiberta's products. <u>Id.</u> at § 3.12; Botifoll Decl., docket no. 28, ¶ 10.  Finally, the Distribution Agreement contains a "Controlling Law" provision, which states in relevant part as follows:

> The validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the State of Washington, U.S.A, the state in which this Agreement is [sic] be *performed by [Beltappo]*.  It is understood, however, that this is a general form of agreement, designed for use in the United States wherever [Beltappo] may desire to sell its products and that any provision herein which in any way contravenes the laws of any state or jurisdiction shall be deemed not to be a part of this Agreement therein.

<u>Id.</u> at 5.05 (emphasis added).

Pursuant to the Distribution Agreement, Rich Xiberta sent purchase requests from Spain to Beltappo's Washington State offices, which in turn transmitted the order to the manufacturer, Zamar.  Belforte Decl. at 9, Ex. F.  After an order was placed, Zamar invoiced Beltappo, which then invoiced Rich Xiberta, and Rich Xiberta deposited payment into Beltappo's bank account at the Bainbridge Island branch of Bank of America.  <u>Id.</u> at Ex. G.  The synthetic corks manufactured by Zamar were shipped to Rich Xiberta's customers in Europe or, as appears on the purchase orders, picked up by Rich Xiberta at Zamar's factory.  <u>Id.</u> at Ex. F; Dalmau Decl. at ¶ 10.  At no time did corks purchased by Rich Xiberta under the Distribution Agreement originate in, pass through, or end up in Washington State.  Dalmau Decl. at ¶ 10.

On other occasions, Rich Xiberta requested samples from Beltappo, which were shipped from Beltappo's Washington State warehouse to Spain, Argentina, and Chile.  Belforte Decl. at ¶ 14.  Rich Xiberta states that it did not request that Beltappo ship the samples from Washington State, nor did it have knowledge that the corks were in fact shipped from Washington State.  Second Dalmau Decl., docket no. 29, ¶ 15.

<u>RXUSA</u>

Rich Xiberta is the parent company of several wholly owned subsidiary companies, including RXUSA, a California corporation.  Botifoll Decl., docket no. 28, ¶¶ 1-2.

ORDER  3–

1   According to RXUSA's General Manager, RXUSA has independent management that

2   determines its own goals, activities, and strategy apart from Rich Xiberta.  Id. at ¶ 2.

3   RXUSA has a contract with Rich Xiberta to purchase and market Rich Xiberta's corks in the

4   United States, but Rich Xiberta does not control or supervise the manner in which RXUSA

5   performs under this contract.  Id. at ¶ 3.  RXUSA also sells wine products such as barrels,

6   bungs, barrel washers, and barrel racks through distribution agreements with other

7   manufacturers.  Id. at ¶ 4.  RXUSA markets its products throughout the United States,

8   including Washington State.  For example, RXUSA has one sales representative whose

9   territory includes Washington State, attends annual trade shows in Washington State, and

10   advertises its products in national wine magazines that are sold in Washington State.  Botifoll

11   Decl. at ¶¶ 11-12.  RXUSA is not a party to this litigation.

12   Litigation in Spain

13       Beltappo filed its Complaint in this case on August 2, 2005.  Docket no. 1.  On

14   October 12, 2005, Beltappo received permission from the Court to serve Rich Xiberta by

15   mail.  Docket no. 4.  Beltappo transmitted the summons and complaint to Rich Xiberta by

16   certified mail, facsimile, and email on October 13, 2005.  Carlson Decl. at ¶ 5.  On October

17   14, 2005, Rich Xiberta filed suit against Beltappo in Santa Coloma de Farners, Spain.

18   Dalmau Decl. at ¶ 12.  In the Spanish litigation, Rich Xiberta argues that the applicable law

19   is the United Nations Convention on Contracts for the International Sale of Goods ("CISG").

20   Beltappo's Request to Supplement the Record

21       After the briefing for the personal jurisdiction motion was complete, Beltappo filed a

22   separate motion requesting leave to supplement the record.  Docket no. 34.  Beltappo seeks

23   to submit evidence that Beltappo was authorized to sell Rich Xiberta's natural corks in the

24   United States and, specifically, in Washington State via an agreement with RXUSA.  For the

25   reasons that follow, the Court does not consider this evidence in addressing Rich Xiberta's

26

ORDER  4–

motion to dismiss.  Accordingly, the Court STRIKES AS MOOT Beltappo's motion to

supplement the record.

## DISCUSSION

I.  Personal Jurisdiction

In Washington State, the long-arm statute and constitutional due process requirements

for personal jurisdiction merge into a single test.  McGowan v. Pillsbury Co., 723 F. Supp.

530, 534 (W.D. WA 1989).  The constitutional test is satisfied if a foreign corporation has

sufficient contacts with the forum state to establish either specific or general jurisdiction.  Id.

The plaintiff bears the burden of establishing that personal jurisdiction exists but, where the

court relies only on affidavits and discovery materials without an evidentiary hearing,

uncontroverted allegations in the complaint must be taken as true and conflicts between the

affidavits must be resolved in the plaintiff's favor.  Ochoa v. J.B. Martin and Sons Farms,

Inc., 287 F.3d 1182, 1187 (9th Cir. 2002).  However, the plaintiff may not rest on the bare

allegations in its complaint.  Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800

(9th Cir. 2004).

A.  Specific Jurisdiction

In Schwarzenegger, the Ninth Circuit described the traditional three-prong test for

specific personal jurisdiction as follows:

> (1) The non-resident defendant must purposefully direct his activities or
> consummate some transaction with the forum or resident thereof; or
> perform some act by which he purposefully avails himself of the
> privilege of conducting activities in the forum, thereby invoking the
> benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's
> forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and
> substantial justice, i.e. it must be reasonable.

374 F.3d at 802 (quoting Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987)).  The plaintiff

bears the burden of establishing the first two prongs of the test and, if the plaintiff fails as to

ORDER  5–

1   either prong, there is no personal jurisdiction in the forum state.  Id.  If the plaintiff succeeds

2   in establishing the first and second prong, the burden shifts to the defendant to present a

3   compelling case that the exercise of jurisdiction would not comport with fair play and

4   substantial justice.  Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-78

5   (1985)).

6                      1. Purposeful Availment

7            The "purposeful availment" prong is present where "the defendant has deliberately

8   engaged in significant activities within a State, or has created continuing obligations between

9   himself and residents of the forum."  Burger King, 471 U.S. at 476 (citations and internal

10  quotations omitted).  The Supreme Court has "consistently rejected the notion that an

11  absence of physical contacts can defeat personal jurisdiction [in another State]."  Id.

12  However, the existence of a contract alone cannot automatically establish sufficient

13  minimum contacts in another forum to create personal jurisdiction.  Id. at 478.  Rather, in

14  determining whether minimum contacts exist, courts must evaluate other factors surrounding

15  the contract, such as prior negotiations, contemplated future consequences, the terms of the

16  contract, and the parties' actual course of dealing.  Id.

17          The parties' rely principally on two analogous cases, Burger King and Roth v. Garcia

18  Marquez, 942 F.2d 617 (9th Cir. 1991), both of which held that personal jurisdiction existed.

19  In Burger King, the defendant, Rudzewicz, entered a franchise agreement to operate a Burger

20  King restaurant in Michigan for a period of twenty years.  471 U.S. at 467.  Plaintiff Burger

21  King Corporation, incorporated in Florida and principally based in Miami, entered into the

22  contract but was not primarily responsible for ensuring day-to-day compliance with its terms

23  because Burger King maintained a regional office that supervised Rudzewicz's restaurant.

24  Id. at 465-67.  Rudzewicz never traveled to Miami to negotiate the contract or perform under

25  the terms of the contract, but he did interact with Burger King employees based in Miami

26  during the negotiation process.  Id. at 466-67.  When Rudzewicz's franchise did not succeed

ORDER  6–

1   and he began missing scheduled franchise payments, Burger King officials in Miami began

2   unsuccessful negotiations with Rudzewicz and ultimately brought suit in United States

3   District Court for the Southern District of Florida.  Id. at 468.  The district court denied

4   Rudzewicz's motion to dismiss for lack of personal jurisdiction but was reversed on appeal

5   by the Eleventh Circuit.  The United States Supreme Court accepted review and reversed the

6   Eleventh Circuit.  Id. at 469.

7          Examining the contract factors listed above, the Burger King Court concluded that the

8   franchise contract had a "substantial connection" to the State of Florida.  Id. at 479.  The

9   Burger King Court cited the following facts: (1) Rudzewicz deliberately reached out beyond

10  Michigan and negotiated with a Florida corporation; (2) the contract was long term; (3) the

11  contract "envisioned continuing and wide-reaching contacts with Burger King in Florida";

12  (4) the relationship was in no sense "random, fortuitous, or attenuated"; (5) Rudzewicz's

13  failure to make scheduled payments and continued use of Burger King's trademarks "caused

14  foreseeable injuries to the Florida Corporation"; (6) Rudzewicz knew that major disputes

15  could be resolved only by the Miami office; (7) Rudzewicz carried on a continuous course of

16  direct communications by mail and telephone with Miami headquarters; and (8) the contract

17  contained a Florida choice-of-law provision that "reinforced [Rudzewicz's] deliberate

18  affiliation with the forum State and the reasonable foreseeablity of possible litigation there."

19  Id. at 479-82.  Based on this "substantial record evidence," the Burger King Court concluded

20  that Rudzewicz had purposefully availed himself of the Southern District of Florida forum.

21  Id. at 478.

22          Similarly, in Roth, the Ninth Circuit concluded that the foreign defendants Marquez

23  (Mexico) and Balcells (Spain) were subject to personal jurisdiction in California.  942 F.2d

24  at 625.  Roth produced films and sought to purchase the rights to *Love in the Time of*

25  *Cholera*, which was written by Marquez, who was represented by Balcells.  Id. at 618.  Roth

26  sought out Marquez and traveled abroad several times in an effort to negotiate the terms of a

1    contract to purchase the film rights.  Id. at 619.  The only negotiations in the United States

2    were the result of meetings that occurred when Marquez and Balcells happened to be in

3    California for other reasons.  Id.  As a term of the contract negotiations, the movie was to be

4    filmed in Brazil, although all of the editing, production work, and advertising would have

5    occurred in California.  Id. at 622.  Additionally, Marquez was to receive a percentage of the

6    net profits from the film once it was completed.  Id. at 619.

7           Finding the question "a very close call," the Ninth Circuit nonetheless held that Roth

8    satisfied the "purposeful availment" prong.  Id. at 622.  The Roth Court concluded that two

9    facts, the defendants' minimal physical presence in California and Roth's initiation of the

10   negotiations, suggested there was no personal jurisdiction.  Id.  However, the Court reasoned

11   that these facts were outweighed by the fact that "most" of the work on the film would be

12   completed in California and Roth would be sending payment to the defendants, the amounts

13   of which depended on California activities.  Id.  Thus, the "economic reality" indicated that

14   "the contract's subject would have continuing and extensive involvement with the forum."

15   Id.

16          In this case, the parties dispute both the scope of the contacts the Court should

17   consider under the "purposeful availment" prong and whether those contacts are enough to

18   satisfy Beltappo's burden.  The first question is whether the Court should consider the

19   activities of both Rich Xiberta and RXUSA, or Rich Xiberta alone.  Beltappo suggests that

20   the Court should consider the economic activities of both Rich Xiberta and RXUSA, while

21   Rich Xiberta contends that RXUSA is irrelevant to the analysis.  Generally, a foreign

22   corporation's contacts with the forum state do not include the activities of a wholly-owned

23   subsidiary.  See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984); Dean v.

24   Motel 6 Operating L.P., 134 F.3d 1269, 1273 (6th Cir. 1998) ("a company does not

25   purposefully avail itself merely by owning all or some of a corporation subject to

26   jurisdiction").  There is an exception to this general rule where the subsidiary acts as the

ORDER   8–

1   parent's general agent.  Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd., 328

2   F.3d 1122, 1134-35 (9th Cir. 2003).  Under the general agent exception, the "plaintiff must

3   make a prima facie showing that the subsidiary represents the parent corporation by

4   performing services 'sufficiently important to the [parent] corporation that if it did not have a

5   representative to perform them, the [parent] corporation ... would undertake to perform

6   substantially similar services.'"  Id. at 1135.

7       Beltappo makes a conclusory assertion that "[i]t cannot be reasonably disputed that

8   but for the existence of Rich Xiberta USA, Rich Xiberta could not market and sell its

9   products in the United States without performing itself the functions it delegates to Rich

10  Xiberta USA."  Pl.'s Resp., docket no. 23, at 15.  Based on the declaration of RXUSA's

11  General Manager, Beltappo's assertion is incorrect.  RXUSA operates independently from

12  Rich Xiberta and has a separate contract with Rich Xiberta to sell Rich Xiberta's products in

13  the United States.  Presumably, if RXUSA did not exist, Rich Xiberta could simply enter into

14  distribution or licensing agreements with other distributors in the United States and would

15  not, as Beltappo suggests, be required to perform RXUSA's functions itself.  RXUSA also

16  sells products other than Rich Xiberta's wine corks.  These products are purchased from

17  separate manufacturers, indicating that RXUSA is more than simply a sales agent of Rich

18  Xiberta.  Accordingly, the prohibition against considering the activities of a foreign

19  corporation's wholly-owned subsidiary applies in this case.  RXUSA's activities are

20  irrelevant.

21      The next question is whether Rich Xiberta's activities in connection with this forum

22  are sufficient for Beltappo to satisfy the purposeful availment prong.  Apart from RXUSA,

23  Beltappo relies on (1) the pre-contract negotiations in which the parties exchanged emails,

24  phone calls, and faxes to and from Washington State; (2) the fact that the contract provided

25  for continuing obligations over a five-year period, including the purchase of several million

26  Beltappo synthetic corks; (3) Rich Xiberta sent several purchase requests to Beltappo in

1   Washington State, received invoices from Beltappo in response, and paid on the invoices to

2   Beltappo's Washington State bank account; and (4) the Distribution Agreement includes a

3   choice of law clause providing for the application of Washington State law.

4           In response, Rich Xiberta contends that minimum contacts do not exist because

5   Beltappo initiated and conducted the negotiations "entirely outside the State of Washington"

6   and the Distribution Agreement "was to be performed entirely outside of the State of

7   Washington." Def.'s Reply, docket no. 27, at 10-11.  First, Rich Xiberta relies on the

8   declaration of Brian Kinsella, Beltappo's agent.  However, the Kinsella Declaration states

9   only he "exchanged email starting in 2002" with Rich Xiberta's agent and received an email

10  from Rich Xiberta's agent on November 11, 2003, requesting specific information regarding

11  a distribution agreement.  Docket no. 30 at ¶ 4.  The evidence suggests that interest in

12  negotiations was mutual and does not demonstrate which party "initiated" negotiations.

13  Moreover, negotiations did not occur "entirely" outside Washington State.  The negotiations

14  included email and telephone communications exchanged between Beltappo in Washington

15  State and Rich Xiberta in Spain.  Belforte Decl. at ¶ 5, Ex. B; Dalmau Decl. at ¶¶ 7-8.

16  Second, Rich Xiberta's assertion that the contract was to be performed "entirely" outside the

17  State of Washington is incorrect.  While Rich Xiberta is correct that the actual shipment and

18  receipt of Beltappo's synthetic corks occurred in Europe, the Distribution Agreement

19  provides that Beltappo's performance is to occur in Washington State.  Helm Decl., Ex. C at

20  § 5.05.  The parties' course of dealings was consistent with this provision in that Beltappo

21  received orders, passed the orders on to Zamar, and received payment in Washington State.

22          Under Burger King and Roth, Beltappo has demonstrated sufficient activity by Rich

23  Xiberta to satisfy the purposeful availment prong of the personal jurisdiction analysis.  Rich

24  Xiberta negotiated directly with a Washington State corporation over a period of several

25  months, sending and receiving communications to and from this State.  As in Burger King,

26  the contract was long term (five years) and envisioned continuing contacts between the

ORDER  10–

1    parties whereby Rich Xiberta would submit orders and payment to Beltappo in Washington

2    State.  Also, Rich Xiberta's alleged breach, if it occurred, caused foreseeable injury to

3    Beltappo, a Washington corporation.  Rich Xiberta knew that any disputes would have to be

4    resolved through communication with Beltappo in Washington State and, if a dispute went

5    into litigation, such a dispute would be presumptively subject to the laws of Washington

6    State under the choice-of-law clause, just as in Burger King.  And, as in Roth, Rich Xiberta's

7    lack of physical presence in Washington State and the extra-forum negotiations do not

8    outweigh the many other factors supporting jurisdiction.  Therefore, on balance, Rich

9    Xiberta's contacts establish that Rich Xiberta purposefully availed itself of this forum.

10                    2. Whether Claim Arises Out of Forum Activities

11          The Ninth Circuit applies a "but for" test to assess whether a plaintiff's claims "arise

12    out of" the defendant's contacts with the forum State.  Glencore Grain Totterdam B.V. v.

13    Shivnath Rai Harnarain Co., 284 F.3d 1114, 1123 (9th Cir. 2002) (finding claims did not

14    arise out of contacts where both parties were foreign corporations, the contract was

15    negotiated, executed, and performed entirely abroad, and the defendant's contacts were

16    unrelated to the contract).  Rich Xiberta briefly contends that Beltappo's breach of contract

17    claim does not arise out of its contacts with Washington State.  Rich Xiberta states only that

18    it "never set foot in Washington to negotiate, execute, or perform the Distribution

19    Agreement" and "[n]o part of Rich Xiberta's performance of the Distribution Agreement"

20    occurred in Washington State.  Def.'s Br. at 15.  In response, Beltappo relies on the contacts

21    discussed above (negotiations to and from Washington State, the orders to and invoices from

22    Washington State, and the choice of law provision).  Rich Xiberta does not discuss this

23    prong of the analysis in its reply brief.

24

25

26

ORDER   11–

1       Beltappo's claim is limited to a breach of the Distribution Agreement.[1]  Rich Xiberta

2  has no other contacts with Washington State other than those relating to the negotiation and

3  performance of the Distribution Agreement.  Beltappo's breach of contract claim clearly

4  arises out of the contacts described above under the Ninth Circuit's "but for" test.

5               3. Fair Play and Substantial Justice

6       If the plaintiff establishes the first two prongs of the specific jurisdiction analysis, the

7  burden shifts to the defendant to "present a compelling case" that maintaining jurisdiction

8  would not comport with fair play and substantial justice.  Schwarzenegger, 374 F.3d at 802.

9  This is a test of "reasonableness," in which courts should consider the following factors: (1)

10  extent of defendant's purposeful interjection; (2) burden on the defendant in defending in the

11  forum; (3) extent of conflict with the sovereignty of defendant's state; (4) forum state's

12  interest in adjudicating the dispute; (5) most efficient judicial resolution of the controversy;

13  (6) importance of the forum to plaintiff's interest in convenient and effective relief; and (7)

14  existence of an alternative forum.  Core-Vent Corp. v. Nobel Industries, A.B., 11 F.3d 1482,

15  1487-88 (9th Cir. 1993).  "None of the factors is dispositive in itself; [courts] must balance

16  all seven."  Id. at 1488.

17       In this case, the factors conflict and lead to no clear result.  First, while Rich Xiberta

18  maintained significant and ongoing contacts with Beltappo in Washington State, those

19  contacts did not include the sale or purchase of products in Washington State; the contacts

20  were limited to contract formation, purchase and payment communications, and the choice of

21  law clause.  The "purposeful injection" factor favors Rich Xiberta.  Second, while the burden

22  of a Spanish corporation litigating in Washington State is apt to be heavy, the Ninth Circuit

23  has noted that "[m]odern advances in communications and transportation have significantly

24  _____

25  [1] Beltappo alleges that Rich Xiberta breached the Distribution Agreement by (1) failing to
make the guaranteed minimum purchases in 2004 and 2005, (2) failing to put forth its best
26  efforts to promote demand for Beltappo's corks, and (3) failing to pay for the products it has
purchased from Beltappo.  Complaint, docket no. 1, at ¶¶ 11-13.

reduced the burden of litigating in another country." <u>Core-Vent</u>, 11 F.3d at 1489.  This factor weighs slightly in favor of Rich Xiberta.  Third, Rich Xiberta concedes that there will be no conflict with a sovereign state because of the choice-of-law provision and the fact that both Spain and the United States are signatories to the CISG.  This factor is neutral.  Fourth, a State maintains a strong interest in providing an effective means of redress for its residents. <u>Id.</u>  Beltappo is a Washington State corporation with its principal place of business in Washington State and, therefore, this factor favors Beltappo.  Fifth, both parties contend that their own forum is the most efficient location to resolve this dispute.  Rich Xiberta contends that most of the individuals and documents are located in Europe and that Spain's legal system will provide a less-complicated means of obtaining testimony from foreign witnesses. In response, Beltappo suggests that Washington State is more efficient because the application of Washington State's law in Spain would require the translation of cases into Spanish and the application of Washington State's common law in Spain's civil judicial system.  This factor does not clearly favor either party.  Sixth, just as Rich Xiberta is burdened by litigating in the United States, Beltappo will be burdened by litigating in Spain. While more of the parties' witnesses may reside in Europe, it will surely be inconvenient for Beltappo and its witnesses to travel to Spain.  This factor weighs slightly in Beltappo's favor. Finally, the availability of Spain as an alternative forum and Rich Xiberta's pending law suit in that forum weighs in Rich Xiberta's favor.

Rich Xiberta bears the burden of presenting a "compelling case" that the maintenance of jurisdiction in this forum would be unreasonable.  Only factors one, two, and seven favor Rich Xiberta in the "fair play and substantial justice" analysis.  The remaining factors either favor Beltappo or are neutral.  Accordingly, the Court finds that Rich Xiberta has failed to satisfy its burden of presenting a compelling case that jurisdiction in this case would be unreasonable.  The Court has specific personal jurisdiction over Rich Xiberta.

1      B. <u>General Jurisdiction</u>

2          If a defendant's activities are substantial, continuous and systematic, a federal court

3   can exercise jurisdiction as to any cause of action, whether or not the cause of action is

4   related to the defendant's activities within the state. <u>Perkins v. Benguet Consol. Mining Co.</u>,

5   342 U.S. 437, 445 (1952). For general jurisdiction to attach, the defendant must have a

6   higher level of contacts with the forum state to support local jurisdiction. <u>See</u> <u>Data Disc, Inc.</u>

7   <u>v. Sys. Tech. Assocs., Inc.</u>, 557 F.2d 1280, 1287 (9th Cir. 1977). Under this heightened

8   standard, and excluding the contacts of RXUSA, Rich Xiberta's contacts with Washington

9   State fall short of establishing general jurisdiction.

10  II. <u>Forum Non Conveniens</u>

11         As an alternative to dismissal for lack of personal jurisdiction, Rich Xiberta argues

12  that the Court should exercise its discretion to dismiss under the *forum non conveniens*

13  doctrine. The party moving to dismiss based on *forum non conveniens* bears the burden of

14  showing (1) the existence of an alternative adequate forum and (2) that the balance of private

15  and public interest factors favor dismissal. <u>Dole Food Co., Inc. v. Watts</u>, 303 F.3d 1104,

16  1117 (9th Cir. 2002). The private interest factors include the residence of the parties and

17  witnesses, availability of compulsory processes for attendance of witnesses, costs of bringing

18  willing witnesses and parties to the place of trial, access to physical evidence, enforceability

19  of judgments, and all other practical problems. <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508

20  (1947). Public interest factors include the burden on local courts, the local interest in having

21  the matter decided locally, familiarity with governing law and avoidance of unnecessary

22  problems in conflicts of law or application of foreign law. <u>Id.</u> at 508-09. A plaintiff's choice

23  of forum is ordinarily entitled to deference unless the private and public interest factors

24  strongly favor trial in the foreign country. <u>Id.</u> at 509.[2]

25

26  [2] Notably, Beltappo offers no substantial opposition to the *forum non conveniens* argument.
    Pl.'s Response, docket no. 23, at 21.

ORDER   14–

1    Rich Xiberta first contends that Spain is an adequate alternative forum for the

2   resolution of this contract dispute.  Other than potentially having to apply Washington State

3   case law in a Spanish court, Rich Xiberta is correct.  However, the balance of private and

4   public interests do not strongly favor dismissal under the *forum non conveniens* doctrine.

5   Parties and witnesses are present in both Washington State and Spain, and there will be costs

6   in bringing witnesses to court in either forum.  The documentary evidence largely consists of

7   the contract and purchase orders/invoices that may be obtained in both forums, and a

8   judgment may be enforced in either forum.  As for the public interest, this Court will be far

9   more familiar with Washington State law than the Spanish courts, and this State has a strong

10  interest in providing a forum for its residents.  Finally, the Court must weigh heavily the

11  deference ordinarily given to the plaintiff's choice of forum.  For all of these reasons, the

12  Court DENIES Rich Xiberta's alternative motion for dismissal under the *forum non*

13  *conveniens* doctrine.

14  III.   Costs and Attorneys' Fees

15    Rich Xiberta's request for costs and attorneys' fees was based on the assumption that

16  it would be successful in its motion to dismiss for lack of personal jurisdiction.  See RCW

17  4.28.185(5) (reasonable attorneys' fees and costs for a party who prevails on a jurisdictional

18  defense under the long-arm statute).  This request is DENIED because the Court has personal

19  jurisdiction over Rich Xiberta.

20  **CONCLUSION**

21    The Court DENIES Defendant's motion to dismiss for lack of personal jurisdiction or,

22  in the alternative, for *forum non conveniens,* and for costs and attorneys' fees.  Docket no.

23  21.  The Court STRIKES AS MOOT Beltappo's motion to supplement the record.  Docket

24  no. 34.

25

26

ORDER   15–

IT IS SO ORDERED.

DATED this 7th day of February, 2006.

Thomas S. Zilly
United States District Judge

ORDER  16–